CHOI & ITO
Attorneys at Law

CHUCK C. CHOI
ALLISON A. ITO
Email: cchoi@hibklaw.com
Email: aito@hibklaw.com
TOPA FINANCIAL CENTER
700 Bishop Street, Suite 1107
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Facsimile:  (808) 566-6900

K&L GATES LLP
DANIEL M. ELIADES
Daniel.Eliades@klgates.com
One Newark Center - 10th Floor
Newark, New Jersey 07102

MARGARET R. WESTBROOK
Margaret.westbrook@klgates.com
301 Hillsborough St., Suite 1200
Raleigh, NC 27603

BRIAN T. PETERSON
Brian.Peterson@klgates.com
925 4th Avenue, Suite 2900
Seattle, WA 98104-1158

Proposed Attorneys for Debtor and
Debtor-in-Possession

Proposed Special Litigation Counsel
for Debtor and Debtor-in-Possession

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>Association of Apartment Owners of<br>Kauai Beach Villas, [1]<br><br>          Debtor and<br>          Debtor in possession | Case No.  25-01103<br><br>(Chapter 11)<br><br><br>Date:   To be set<br>Time:   To be set<br>Judge:  Hon. Robert J. Faris |

**DECLARATION OF LARRY D. WARNER IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND APPLICATIONS FOR FIRST DAY RELIEF**

---

[1] The last four digits of Debtor's tax identification number are 0764.

1

Larry D. Warner, of full age, hereby certifies and declares pursuant to Title 28 of the United States Code, Section 1746, as follows:

1.     I am the President of the Board of Directors of the Apartment Owners of Kauai Beach Villas ("Debtor" or "Association"), and have served in that capacity since 2021.

2.     I make this declaration ("Declaration") based on my personal knowledge, a review of records of Debtor, a review of documents publicly filed, and/or information available through counsel, agents and/or representatives of the Association.

3.     I submit this Declaration to assist the Bankruptcy Court and parties in interest in understanding the events and circumstances leading to the commencement of this case, and in support of the motions and other "first day" pleadings filed by Debtor (collectively, the "First Day Motions"), as set forth in more detail in Section O of this Declaration. I am authorized to submit this Declaration on behalf of Debtor.

4.     If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

5.     On December 5, 2025 (the "Petition Date"), the Association filed a voluntary petition for relief pursuant Subchapter V of title 11 of the United States

2

Code[2] (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Hawaii (the "Bankruptcy Court"). Since the Petition Date, Debtor has remained in possession of its assets and has continued management of its property, business, and affairs.

## A.  History of the Association and Governing Documents.

6.      The Association is a registered not-for-profit corporation organized under the laws of the State of Hawaii pursuant to a Certificate of Incorporation filed with the Secretary of State of Hawaii, Department of Commerce and Consumer Affairs, on April 15, 2025.

7.      The Association was formed pursuant to a Declaration of Horizontal Property Regime dated June 5, 1981, recorded in the Bureau of Conveyances on June 8, 1981  of the State of Hawaii (the "Bureau") in Liber 15596 at Page 1, as amended and restated by that certain instrument dated November 8, 1994, recorded in the Bureau on November 10, 1994, as Document No. 94-185714, which was subsequently amended by those certain instruments dated January 9, 1996, recorded in the Bureau on January 11, 1996, as Document No. 96-003864, dated May 28, 1998, recorded in the Bureau on June 3, 1998, as Document No. 98-079978, dated February 16, 2001, recorded in the Bureau on March 1, 2001, as Document No. 2001-028162, and dated February 14, 2006, recorded in the Bureau on February 24,

---

[2] All references to the "Bankruptcy Code" herein refer to 11 U.S.C. §§101-1532.

1603750327.4

2006, as Document No. 2006-037041 (the foregoing being collectively referred to as the "Declaration").

8.       The Declaration created a plan for development and establishment of a condominium for the resort known as Kauai Beach Villas. The resort is managed, maintained and administered by the Association.

9.       The original Bylaws of the Debtor were attached to the Declaration and incorporated therein by reference. The Bylaws were restated by Restated By-Laws of the Debtor, which reflects that the Debtor was organized and exists to manage, maintain, acquire, construct and care for the resort. The Restated By-Laws were dated November 8, 1994, and recorded in the Bureau on November 10, 1994, as Document No. 94-185715. The Bylaws were subsequently amended by that certain instrument dated May 28, 1998, recorded in the Bureau on June 3, 1998, as Document No. 98-079978. The Bylaws as restated and amended are hereafter referred to as the "Bylaws".

10.      Section 1 of Article II of the By Laws states:

The Association shall be organized and operated for the purposes of managing, maintaining, acquiring, constructing and caring for the Association property, and it is intended that the Association shall qualify as a "Homeowners' Association" within the meaning of Section 528 of the Internal Revenue Code. The Association property includes the common elements of the Project, as well as the Project itself, property held by the Association, property commonly held by its members, property within the Association and/or Project privately held by its members but which may be subject to a common maintenance assessment by the Association for such purposes as insurance, and

4

property owned by a government agency and used for the benefit of the Association's members.

11.     Pursuant to Section 1 of Article III of the By Laws, the Association is governed by a Board of Directors (the "Board"). The members of the Board are currently: Larry D. Warner, President; Linda Kolstad, Vice President; George Keeney, Treasurer; Jim DeRose, Secretary; and Kevin Garner.

**B.     The Interval Association.**

12.     A Declaration of Covenants, Conditions and Restrictions for the PAHIO At Kauai Beach Villas Interval Ownership Plan, dated March 13, 1995, established a timeshare interval ownership plan within the condominium, known as PAHIO at Kauai Beach Villas (the "Timeshare Declaration") which was recorded in the Bureau on March 14, 1995 as Document No. 95034656. The Timeshare Declaration created the PAHIO at Kauai Beach Villas Interval Owners Association (the "IOA" or "Interval Association") as well as the by-laws for governance by the Interval Association. The Interval Association is responsible for the management of the timeshare plan. Pursuant to Article I, Section 3 of the Timeshare Declaration, the purpose of the Interval Association "is to provide the means whereby the use, possession and ownership of the Intervals in the Project that are submitted to the Plan are governed."

13.     The Interval Association is a subpart of the Association. All members of the Interval Association are also members of the Association.

1603750327.4

14.     The Interval Association is governed by a Board of Directors (the "IOA Board"), which is separate from the Association Board. The IOA Board includes Larry Warner, Alan Fern, Linda Kolstad, George Keeney, and Ryan Nobriga. Larry Warner, George Keeney and Linda Kolstad are also members of the Association Board.

15.     Pursuant to the bylaws of the Interval Association, the IOA Board establishes a budget for the Interval Association, assesses maintenance fees and special assessments to members of the Interval Association and collects those fees for the Interval Association, and pays maintenance fees and special assessments to the Association as the same are assessed by the Association to the Interval Association.

## C.     Debtor's Ownership Structure.

16.     Section 1 of Article II of the Bylaws provides that each "Apartment Owner" is a member of the Association (the "Association Members"). That provision of the Bylaws also states that Association Members shall be entitled to that fraction of the total vote of all the Apartment Owners which equals the percentage of the common interest appurtenant to such Apartment as set forth in the Declaration.

17.     Section 1 of Article I of the Bylaws includes the following defined terms:

> "Owner" or "Apartment Owner" means a person owning severally or as a co-tenant an apartment and the common interest appertaining thereto,

6

to the extent of such interest so owned; provided that to such extent and for such purposes, including the exercise of voting rights, as shall be provided by lease registered under Chapter 501, Hawaii Revised Statutes, or recorded under Chapter 502, Hawaii Revised Statutes, a lessee or sublessee of an apartment or interest therein shall be deemed to be the Owner of such apartment or interest therein. The purchaser of an apartment pursuant to an agreement of sale recorded in the Bureau of Conveyances shall have the rights of an Apartment Owner, including the right to vote; provided that the seller may retain the right to vote on matters substantially affecting his security interest in the apartment as provided in Section 514A-83 of the Act. "Apartment" as used herein has the same meaning and definition as contained in the Act and is sometimes hereinafter called a condominium unit or units and includes each of the apartments of the Project.

**D.      The Project.**

18.      The Kauai Beach Villas resort (the "Project") is located at 4330 Kauai Beach Drive, Lihue, Kauai, Hawaii.[3] Pursuant to the Declaration, the Project consists of eight (8) separate three-story buildings, designated as buildings "A" - "H" containing a total of one hundred and fifty (150) Apartments. Each building consists of multiple one- and two-bedroom apartments. The Project also includes two (2) administrative buildings that are being leased by the Association, a pool, and a pool-use building. The complex was constructed in the 1980s.

---

[3] At Section 1 of Article I, the Bylaws define the Project as including ". . . the Land, the buildings and all other improvements thereon (including the Apartments and the common elements) and all easements, rights and appurtenances belonging thereto, and all other property affixed thereto and intended for use in connection therewith.

1603750327.4

19. All of the Project is governed by the Association, including all Apartments. However, one hundred and five (105) of the one hundred and fifty (150) Apartments are utilized as timeshare.

**E.    Debtor's Ownership Interest in the Project.**

20. Pursuant to a Warranty Deed dated September 20, 2025, PAHIO Vacation Ownership, Inc. ("PAHIO"), conveyed to the Association all the right, title, interest and claim of PAHIO to the following real property at the Project:

> *An undivided 2/102 interest in Apartment No. 12 at the KAUAI BEACH VILLAS, a condominium as described in the Declaration of Horizontal Property Regime as recorded in Official Records Liber 15596, Page 1, Bureau of Conveyances of the State of Hawaii, and all amendments thereto.*

21. The Warranty Deed was dated September 20, 2025, and recorded on October 1, 2025, at the Bureau as Doc No. A-9405000260.

22. Debtor owns two (2) every other year intervals at the Project and a concomitant share of the common elements at the Project (the "Association Interest"), which comprises approximately .0159% of the total ownership interest at the Project. The Association owns the common element share of the Association Interest as a tenant-in-common with all other Association owners.

23. PAHIO, Pahio at Kauai Beach Villas Interval Owners Association, and PTVO Owners Association, Inc. ("PTVO")[4] own a combined 30.26% of the Project.

_____

[4] Upon information and belief, pursuant to the Declaration of Covenants, Conditions and Restrictions; Grant and Reservation of Easements for Club Wyndham Access Vacation Ownership Plan ("CWA"), dated January 3, 2008, as amended, supplemented or restated from time to time (the "Club Declaration"), PTVO,

8

The Association owns approximately .0158% of the Project, on account of the Association Interest. The remaining ownership interests in the Project (approximately 69.69% of the total) are owned by approximately 6,893 parties to corresponding contracts ("Interval Owners"), with each interval having its own separate corresponding contract and forty-five (45) whole owners, (collectively, "Whole Unit Owners"), all whom are members of the Association. Interval Owners and Whole Unit Owners are collectively referred to herein as "Owners" or "Members".

## F.     Projects Reoccupy and Remediate.

24.     On or about March 20 2020, the Project's ground floor units in buildings "A" – "E" were flooded.  As a result of this flood, and the remedial work related thereto, many of the Project's buildings' walls were opened, and it was discovered that, among other things, construction deficiencies, i.e., from the original construction of the Project, existed throughout all buildings in the Project, and this was causing systemic waterproofing, structural (mass corrosion of support columns), and other failures.  The worst buildings were those closest to the ocean, i.e.,

---

a non-stock, non-profit corporation duly organized and existing under the laws of the State of Delaware, and Wyndham Vacation Resorts, Inc. ("WVR") created a multi-site timeshare program known as Club Wyndham Access.  Upon Information and belief, pursuant to a Declaration of Trust for CWA dated as of January 4, 2008, as amended, supplemented or restated from time to time, (the "Trust Declaration") PTVO and WVR created an irrevocable trust to hold legal title to certain real property interests in one or more resort properties ("Club Properties") that have been subjected to the Club Declaration. Upon information and belief, the Club Properties are deeded to First American Trust, a Federal Savings Bank ("First American Trust").  Upon information and belief, First American Trust is the trustee under the Trust Declaration.  Upon information and belief, PTVO is the beneficiary under the Trust Declaration.

1603750327.4

Buildings G and H. In order to determine the approximate cost of the remedial work, the Association's Board of Directors retained a cost estimator. The cost estimator informed the Association that the Project requires at least $70 million in repairs, renovations and/or capital improvements. Buildings G and H are presently unoccupied due to, among other things, compromised post-tension steel cables.

25. A letter from the Board to Association Members, dated November 22, 2024, provided the following summary regarding the Board's attempts at reopening Buildings G and H, and regarding the overall approximate costs to remediate all the buildings in the Project:

*The 2024 AOAO Owners Annual Meeting was held virtually on October 10. Thank you to all the owners who took the time to attend. For those of you unable to attend, the following is some of the information presented at the meeting and responses to some of the questions asked.*

*Project Reoccupy (post tension repairs to buildings G & H)*

*As of October 7th, $3.3M or 82% of the total of the $4.1M special assessment has been collected with continuing collections ongoing based on the association's billing and collection policy. The board has retained Wiss, Janney, Elstner Associates, Inc. (WJE) to generate design drawings and project manager The Hardy Group (THG) to create bid specifications to be used in the preparation of bid packages. THG hopes to have bids before the year end. They have met with the Kauai County permit department at which time the County instructed them to submit permit requests for emergency work, stating that work is likely to be authorized, and the necessary permits granted. The County also requested River Focus, the engineering firm that performed the flood study, to use their existing data to create new drawings that meet FEMA specifications. This impacts Project Remediate as well (additional details below).*

*THG has informed us of their requirements before work starts:*

10

- *Buildings G & H __must be completely vacated__.*

- *Management will need keys to every unit. It may be necessary to master key the apartments.*

- *All fragile/breakable/valuable items should be removed from the unit or locked away. Each homeowner of the affected units is responsible for ensuring that such items are removed or locked away.*

- *It is recommended that the furniture be protected. There will be jackhammers and destructive work that will generate dust. The contractor will provide some protection, and we will try to mitigate dust, but added protection is recommended and that is the responsibility of each affected homeowner.*

*Project Remediate (extensive repairs to all eight buildings)*

*As noted above, THG has met with Kauai County to discuss the River Focus flood study and as a follow-up River Focus is working on creating reports and FEMA compliant maps to address the County's questions. The County's position on the flood study will impact the work needed to mitigate future floods.*

*Based on current cost estimates provided by third party experts, Project Remediate will require a special assessment currently estimated at $67,200,000. The intent is for the funds to be collected over three years with funding in installments of $22,400,000 per year unless the contractor requires us to guarantee all the funds before work begins. Three installments will amount to the following assessments per unit per year:*

| Unit Type | Total Per Unit | 1/3 Installment |
|---|---|---|
| *2BR/2Bath – Type 5,6* | *$548,352* | *$182,784* |
| *2BR/2Bath  -  Type 1,2,3* | *$543,648* | *$181,216* |
| *2BR/2Bath – Type 4* | *$539,616* | *$179,872* |
| *1BR/2Bath* | *$376,320* | *$125,440* |
| *1BR/1Bath* | *$311,808* | *$103,936* |

1603750327.4
U.S. Bankruptcy Court - Hawaii   #25-01103   Dkt # 11   Filed  12/07/25   Page 11 of 42

**G.     The Reserve Study.**

26.     The Board commissioned a reserve study from Vertical Hawaii Home Inspections & Reserve Studies LLC dated January 1, 2025 (the "Reserve Study"). A copy of the Reserve Study is attached at **Exhibit "A"** hereto.

27.     The Reserve Study:

> assumes $56,000,000 will be collected from the ownership by special assessment primarily to fund building remediation work as provided by Association representatives. It is assumed that the special assessment will commence in fiscal year 2025 and will continue for the duration of the project. Considering the extent of the building remediation project and related expense, all other projects have been postponed to after completion of the building remediation project. According to property representatives, repairs to existing components will be performed if needed to extend the useful of the components, and the expense to perform the repairs will be covered as an operational expense.

Reserve Study at 4.[5]

28.     The Reserve Study also assumes that nearly $19 million would be raised by the Association in each of 2025, 2026 and 2027 to fund repairs and capital improvements at the Project. *Id*. at 7.  However, such funds were not raised in 2025 since the Board was focused on raising the funds needed to reopen Buildings G and

---

[5] The reserve study of Armstong Consulting, Inc., dated May 3, 2024, noted that "the replacement, repair and/or refurbishment of the short-lived building and site improvements for the common elements such as but not limited to exterior painting, roofing, mechanical equipment and pavement. The total current cost of the components included in this study is $58,744,146 and the total future cost is $74,528,056.

1603750327.4

H, and as a result, the nearly $19 million per year are not projected to be raised in 2026 or 2027.

29.     Apart from the $56 million in reserve contributions that were projected to be raised from special assessments in 2025-2027, the Reserve Study recommended that Owners fund annual reserve contributions of $1.1million in 2025, with annual increases thereafter. *Id*.

## H.     Maintenance Fees and Special Assessments – Projects Reoccupy and Remediate.

30.     By Board Resolution on Special Assessment dated December 6, 2023, and approved at an Association Board Meeting held on December 4, 2023, the Association issued a special assessment of $4.1 million to all Owners for Project Reoccupy (the "Project Reoccupy Assessment"). The Interval Association partially funded the Project Reoccupy Assessment: with approximately 18.57% of the Project Reoccupy Assessment payable from the timeshare being outstanding and past due. Whole Unit Owners partially funded the Project Reoccupy Assessment; with approximately 6.68% of the Project Reoccupy Assessment payable by Whole Unit Owners being outstanding and past due. The Association has received $3,488,098 of the $4.1 million Project Reoccupy Assessment.  The Board is currently attempting to collect the unpaid balances from several owners, including the initiation of foreclosure proceedings.  Given the approximately 16% default rate on the $4.1 special assessment for Project Reoccupy, the Board is concerned that if there is a

1603750327.4
U.S. Bankruptcy Court - Hawaii   #25-01103   Dkt # 11   Filed  12/07/25   Page 13 of 42

greater default rate by attempting to raise the $70 million for Project Remediate (i.e., the approximate cost to remediate all buildings), the deficit will be at least $14,000,000. With no lender on the islands willing to loan the Association any or all of the $70 million required, and having the inability to raise all of the funds required to remediate all of the buildings, the Association's Board faces the current dilemma of being obligated to maintain and repair the buildings at the Project, but not having the funds to do so.

31.     As noted, the Project Reoccupy Assessment was intended to fund repairs necessary to make Buildings "G" and "H" habitable, per cost estimates received by the Board. Due to cost overruns and newly discovered issues (e.g., more failed post-tension steel cables in Building G, which Building H to be the next building to be worked on) with Building "G" and now likely with Building "H", the Project Reoccupy Assessment will not be sufficient to make Buildings "G" and "H" habitable.

32.     To date, approximately, $1,515,379.12 has been expended on Building "G" alone. Present estimates are that at least an additional $2,544,185 will be required to make Building "G" habitable; however, there is currently approximately $2,417,176 left of the Project Reoccupy Assessment.

33.     Work to make Building "H" habitable has not commenced and, given the extent of the work needed to Building "G", it is likely unfunded.  As of 11/21/25

1603750327.4
U.S. Bankruptcy Court - Hawaii   #25-01103   Dkt # 11   Filed  12/07/25   Page 14 of 42

$851,831 of the Project Reoccupy budget for Building "H" has been reallocated to Building "G".

34.     Subject to a change in circumstances and/or consultation with real estate professionals engaged by the Association, the Board intends to continue with the remedial work to Building "G" until the special assessment funds are depleted. Upon consultation with real estate and other professionals engaged by the Association, the Board intends to determine what is in the best interest of the Association in terms of proceeding with the remedial work to reoccupy Building "H".  In the meantime, Building "H" will remain closed.

35.     Project Remediate <u>will require a special</u> <u>assessment which is</u> <u>currently estimated at $67 million.</u> The special assessment to Owners for Project Remediate ranges from at least $311,000 for a 1 bedroom/1 bath Apartment to at least $548,000 for a 2 bedroom/2bath Apartment.

36.     The Board has not made a special assessment for Project Remediate, first given the concerns with the default rate with the special assessment for Project Reoccupy.  Now, in light of the Owners' vote to file bankruptcy, and seek an allowance to market the Project for sale, the Board does not anticipate proceeding with Project Remediate, but it will exercise its due diligence to address various safety hazards that continue to exist on the property.

1603750327.4

37.     The Interval Association is current in its maintenance fee obligations to the Association. As of November, 2025, approximately $134,098 in past due maintenance fees was due to the Association by Whole Unit Owners. The Association continues to pursue collection efforts, including judicial foreclosure, through its general legal counsel.

**I.      Current Project Status.**

38.     Wiss, Janney, Elstner Associates Inc. ("WJE") inspected the Project on September 4, 2025, to complete a visual condition assessment of the exterior facade of buildings at the Project and for the continuation of its interim assessments program.  A copy of the WJE report to the Board, dated September 19, 2025, (the "9/25 WJE Report") is attached at **Exhibit "B"** hereto. The conclusion of the 9/29 WJE Report is as follows: "At your request, WJE has conducted a reassessment of the residential buildings at Kauai Beach Villas to identify structural safety concerns for which mitigation is recommended. Based on the reassessment, we have recommended your immediate action on several mitigation measures. Additional recommendations have been made regarding further assessment and repairs. We strongly recommend that you proceed with urgency with the work required to implement repairs. Another reassessment is recommended in six months. We would be happy to discuss these recommendations and the next steps with you."

1603750327.4
U.S. Bankruptcy Court - Hawaii   #25-01103   Dkt # 11   Filed  12/07/25   Page 16 of 42

39.     October 7, 2025, given, among other things, the safety concerns outlined in the 9/25/ WJE Report, the IOA Board voted unanimously to (i) restrict access to the 105 Apartments within the Interval Association as of January 5, 2026, and (ii) suspend reservations for the 105 Apartments within the Interval Association after January 1, 2026.  Despite restricting access/occupancy, upon information and belief, the IOA Board presently intends to continue to pay maintenance fees to the Association for 2026.

## J.     Management of the Project.

40.     The Association, through its Board, is responsible for the operation, management and maintenance of the Project. Section 3 of the By Laws specifically gives the Board the right to manage the Project, including hiring a management company.

41.     The Association has historically retained professional management for the Project. The Association and PAHIO Resorts, Inc. ("PRI" or "Project Manager") are parties to that certain Amended & Restated Management Agreement dated January 1, 2014 (the "Management Agreement"). Pursuant to the Management Agreement, the Association appointed Project Manager to provide certain services (collectively, the "Services") as manager of the property for a term of three years, which automatically renews for successive one-year periods unless terminated upon ninety days' written notice by either party of its intent not to renew upon the

1603750327.4
U.S. Bankruptcy Court - Hawaii   #25-01103   Dkt # 11   Filed  12/07/25   Page 17 of 42

conclusion of the then-current period. The Services provided by the Project Manager include, but are not limited to, (a) maintaining the Association's books and records, (b) conducting business correspondence on behalf of the Association, (c) maintaining a master list of owners of interests in the Association, (d) maintaining the Project and repairing individual units as needed, (e) contracting with vendors and service providers, (f) entering into contracts, concessions and leases for the operation of the Project, (g) use of machinery and equipment at the Project, (h) bid for services , maintenance and material  for the Project; (i) providing housekeeping services to the Association, (j) accessing the Project as necessary, (k) hiring and compensating employees working on behalf of the Association, (l) hiring experts including attorneys, tax consultants, accountants and other professionals as necessary, (m) providing various financial services, including maintaining bank accounts, coordinating all accounts payable, preparing financial statements and records, developing an annual budget, coordinating the preparation and filing of necessary tax returns, and processing payroll obligations, (n) **obtaining and maintaining all necessary insurance coverage**, (o) providing general client services in the administration of meetings of the Board and the Association and (p) providing IT services.

42.     The foregoing contractual arrangements are necessary for Debtor to continue operating the Project in the ordinary course, as it does not employ or

U.S. Bankruptcy Court - Hawaii   #25-01103   Dkt # 11   Filed  12/07/25   Page 18 of 42

compensate any employees directly and, therefore, would be unable to continue operations without the benefit of the Management Agreement or a replacement agreement with a professional management company.

43.     By letter dated April 14, 2025, pursuant to Section 4 of the Management Agreement, the Project Manager provided the Association with written notice of its election not to renew the Management Agreement upon expiration of the current term. Accordingly, the Management Agreement shall terminate effective as of the close of business on December 31, 2025 (the "Termination Date").  As of the Termination Date, the Project Manager will no longer provide Services to the Association, including insurance coverage.  However, as of the date of this Declaration, the Property Manager and the Association are in negotiations to enter into a new management agreement post-petition.

44.     The Association is a named insured under a crime insurance policy issued by Travelers Casualty and Surety Company of America, with an effective date that runs through April 1, 2026. The Debtor is also a named insured under a Non-Profit Organization Management Liability Policy with an effective date that runs through April 1, 2026. HDI Global Specialty SE is the insurer under such policy.

45.     The Association has obtained a quote to continue the following forms of insurance coverage that are set to expire on January 1, 2026: special form

1603750327.4
U.S. Bankruptcy Court - Hawaii   #25-01103   Dkt # 11   Filed  12/07/25   Page 19 of 42

commercial property (150 units); earthquake and flood; equipment breakdown; general liability; and excess liability. The Board has authorized the payment of the entire premium amount of $480,107.83. The cash collateral budget discussed below at paragraph 91 contemplates this payment being made post-petition.

**K.      The Minority Owner Litigation.**

46.      In 2022, Association Members Allan Rouhier, James Barkley, Don Hazelquist, Margaret Zacharias, Robert Hall, Janet Grogan, Steve and Sandy Anderson, Bruce and Lynne Gascoigne, Saeed Abousaeedi, Gary and Sharlene Schmauch, Duane Carlson, Richard Leach and Susan Budzien, Judy Dalton, Chuck Ashton, Carole Hinck, Samuel and Christine Riley, Jerome Roache and Lynn C. Tuttle, and 49-50 Properties LLC filed a lawsuit in the Circuit Court of the Fifth Circuit State of Hawaii (the "Fifth Circuit Court") against Association of Apartment Owners of the Kauai Beach Villas; PAHIO Resorts, Inc., Wyndham Destinations, Inc. dba Wyndham Destinations and/or Wyndham Destinations; PAHIO at Kauai Beach Villas Interval Owners Association, Larry Warner; Linda Lee Kolstad, Mark Twardzicki, George Keeney, Jim Derose, John Does 1-25; Jane Does 1-25; and Doe Entities 1-25, Case Number: 5CCV-22-0000029 (the "Minority Owner Litigation").

47.      Plaintiffs claim that defendants, particularly the Association, failed to properly maintain Buildings F-H, which deteriorated due to the alleged uneven allocation of maintenance resources to Buildings A-E where timeshare participants

1603750327.4

are in the majority. The Association denies all liability for claims raised in the Minority Owner Litigation.[6] The Minority Owner Litigation has been dismissed, with prejudice, against certain defendants but remains pending against the Association and certain members of the Board.

48.     After a pretrial conference held on October 9, 2025, the Fifth Circuit Court entered an Order Continuing Trial Date, Pretrial Deadlines and Defendants' Motions for Summary Judgment and Order based on the Association's decision to file for bankruptcy.  The Association intends to remove the Minority Owner Litigation to this Court.

## L.     The Insurance Coverage Litigation.

49.     In 2024, the Association filed a lawsuit in the Circuit Court of the First Circuit State of Hawaii (the "First Circuit Court") against Federal Insurance Company, American Home Assurance Company, National Union Fire Insurance Company of Pittsburgh, PA, Starr Surplus Lines Insurance Company ("Starr Surplus"), and Doe Defendants 1-100, Case Number: 1CCV-24-0000663 (the "Coverage Action"). The Coverage Action involves claims by the Association against its insurers for failing to acknowledge their duty to defend and indemnify the

---

[6] The Association and Board member defendants deny any/all allegations of liability to Plaintiffs and by choosing not to address any such allegations in this pleading, the Association and Board defendants do not concede the veracity or validity of Plaintiff's allegations. Rather, all defenses of the Association and Board defendants to the allegations of Plaintiffs are reserved.  The Association also reserves all affirmative claims against the Plaintiffs.

21

Association in the Minority Owner Litigation and for their bad faith handling of the tendered claim. The Coverage Action is pending.

50. In March of 2025, the First Circuit Court granted partial judgment in favor of the Association on its request for declaratory relief against Federal Insurance Company which was ordered to defend the Association and immediately reimburse the Association for fees and costs incurred in connection with the defense of the Minority Owner Litigation. Separately, the Association agreed to dismiss Starr Surplus from the lawsuit without prejudice in exchange for an agreement that Starr Indemnity will defend the Association under a purported reservation of rights and payment of $75,000.

**M.     The 2026 Budget.**

51. On November 10, 2025, the Board approved the 2026 budget for the Association. A copy of the 2026 budget is attached at **Exhibit "C"** hereto.  The 2026 budget calls for no maintenance fee increase at this time, and a rolling over of the 2025 budget.[7]  However, the Board will revisit its operating budget in the next 60 to 90 days, as the Association intends to request that the Bankruptcy Court allow the Association to use its current reserve funds to pay the Association's administrative costs and expenses.

---

[7] Upon information and belief, the Interval Association intends to fund its 2026 maintenance fee obligation to the Association from operating funds on hand.

1603750327.4
U.S. Bankruptcy Court - Hawaii   #25-01103   Dkt # 11   Filed  12/07/25   Page 22 of 42

52.     If the Association's request to use the reserve funds is denied, the maintenance fee increase will be due to, among other things, the administrative costs and expenses, and the funding deficiencies in the collection of assessments. which is estimated to reach 25% of the whole owner's share of maintenance fee assessments.

53.     Under that scenario, the maintenance fee increase is projected as follows:

| Unit Types: | 2026 | 2025 |
|---|---|---|
| 2 Bed/2 Bath - 5, 6 | $4,426.78 | $2,609.56 |
| 2 Bed/2 Bath - 1, 2, 3 | $4,388.80 | $2,587.18 |
| 2 Bed/2 Bath - 4 | $4,356.25 | $2,567.99 |
| 1 Bed/2 Bath | $3,037.98 | $1,790.88 |
| 1 Bed/1 Bath | $2,517.19 | $1,483.87 |

## N.     Pre-Petition Resolutions.

54.     On September 19, 2025, at a duly called and conducted special meeting of the Association Members (pursuant to the Bylaws), the requisite number of Association Members voted to authorize the Board to file a chapter 11 bankruptcy petition for the Association to, among other things and subject to Bankruptcy Court approval, market and sell the entire Project, free and clear of the interests of all Association Members (including non-debtor owners), with such interests to attach to the proceeds of sale, subject to distribution pursuant to Bankruptcy Court order. The minutes of the special meeting (the "9/25 Minutes") are attached at **Exhibit "D"** hereto.

1603750327.4
U.S. Bankruptcy Court - Hawaii   #25-01103   Dkt # 11   Filed  12/07/25   Page 23 of 42

55.     As reflected in the 9/25 Minutes, at the special meeting, Association members specifically voted to authorize the Board to:

(a) file a chapter 11 bankruptcy case on behalf of the Association, retain professionals, and take related actions – **with 81.829% of the Apartment Owners present at the meeting (in person or by proxy) voting in favor**; and

(b) acquire or accept a unit or interval on behalf of the Association – **with 70.352% of the common interests voting in favor**[8].

**O.     Debtor's Intentions in its Bankruptcy Proceeding.**

56.     Among other things, the Association intends to seek, subject to Bankruptcy Court approval as may be required, all or some of the following relief in its bankruptcy proceeding:

- Association Member consent to the sale of their undivided interest in the Project, jointly with the sale of the interests of Debtor and other members, pursuant to 11 U.S.C. §363(h). Absent such consent, Debtor intends to seek judgment authorizing the sale of Debtor's undivided interest in the Project, jointly with the sale of the interests of the Association Members, pursuant to 11 U.S.C. §363(h). Debtor reserves the right to file a lawsuit against consenting owners for a judgment from the Bankruptcy Court authorizing the sale of consenting owners' interests in the Project pursuant to 11 U.S.C. §363(h) and the Member Consent discussed below.

- Approval of marketing, bid and sale procedures for the Project.

---

[8] The votes to file bankruptcy are based on the members or owners present at a duly called meeting, whereas the vote to acquire an interest in property is based on the vote of the entire membership. Both measures passed pursuant to the Association's Governing Documents.

24

- Authorization to sell the Project and all interests therein free and clear of the interests of all members (Debtor and non-debtor), with such interests to attach to the proceeds of sale, subject to distribution by bankruptcy court order in accord with 11 U.S.C. §§363(b), (f) (h) and (j).

- Termination or amendment of the Declaration and/or Timeshare Declaration effective at or prior to closing of the sale of the Project.

- Authorization to assume and assign to a purchaser, or reject and terminate, all executory contracts and unexpired leases to which the Association is a party – at closing.

- Authorization to distribute net sale proceeds (after costs of administration and sale) as well as all remaining cash, escrows, and reserves of the Association pursuant to a confirmed plan of liquidation or other Bankruptcy Court order. Distribution to Association Members may be subject to set-off of amounts owed to the Association for delinquent maintenance fees and/or special assessments.

- Resolution of all claims against the Association, include those asserted in the Minority Owner Litigation.

- Dissolution of the Association following sale and distribution pursuant to a confirmed plan of liquidation or other Bankruptcy Court order.

**P.    Assets and Liabilities of Association.**

57.    Debtor funds its operations through the maintenance fees and assessments from Association Members with various interests in the Project.  As of the Petition Date, Debtor's assets included:  (i) approximately $629,678 in cash and cash equivalents held at First Hawaiian Bank, approximately $2,658,551 in a reserve account and approximately $21,168 in an investment account at Merril Lynch, (ii)

1603750327.4

minimal accounts receivable, and (iii) an undetermined value of the Association Interest in the Project. In addition, the Association is a party to an Escrow Agreement for Association of Apartment Owners of Kauai Beach Villas and the Individual Unit Owners (as amended, the "Escrow Agreement") with First American Vacation Ownership Title and Escrow Services ("Escrow Company") dated January 30, 2024, for the purpose of paying for repairs and expenses to Building G and H. As of the Petition Date, Escrow Company was holding approximately $1,986,145 pursuant to the Escrow Agreement.[9]

58.      Debtor has one secured creditor, Bank of Hawaii, which loaned Debtor $1,900,000 pursuant to a Master Note and Credit Agreement dated as of January 2, 2014 (the "BOH Loan.") The BOH Loan is secured by a lien on Debtor's "accounts" and "rights to assess and collect . . . maintenance fees . . ." as evidenced by a UCC-1 financing statement filed at the Bureau on December 30, 2013, as Document No. A-51120364 and two continuation statements filed at the Bureau on October 8, 2018, and on November 14, 2023, as Doc Nos. A-68550156 and A-87180236, respectively.

---

[9] The Association takes the position that the Escrowed Funds are not property of the estate but rather property of the Owners.

1603750327.4
U.S. Bankruptcy Court - Hawaii   #25-01103   Dkt # 11   Filed  12/07/25   Page 26 of 42

59.     Debtor is current on the BOH Loan and intends to continue making principal and interest payments of $13,030 per month.  The current balance on the BOH Loan, prior to the December 1st payment, was approximately $446,341.83.

60.     Debtor's other liabilities generally relate to the maintenance and operation of the Project, including, but not limited to, landscaping, housekeeping, and other general maintenance fees.  Debtor has been paying its recognized liabilities in the ordinary course leading up to the Petition Date.

**Q.     First Day Motions.**

61.     Concurrently with the filing of the Chapter 11 Case and this Declaration, Debtor filed certain First Day Motions[10] seeking orders granting various forms of relief intended to maintain the Project, facilitate the efficient administration of the Chapter 11 Case, and expedite the sale process.

62.     I believe that it is critical that the First Day Motions be heard as soon as practicable. If such motions are not considered on an expedited basis, it could lead to immediate and irreparable harm to the Project and the interval interests owned by the Association Members. I believe expedited consideration and approval of the emergency First Day Motions is in the best interest of all interested parties in the Chapter 11 Case.

---

[10] Capitalized terms used but not otherwise defined herein shall having the meanings ascribed to them in the applicable First Day Motion.

63.     Certain of the First Day Motions request authority to pay prepetition claims against Debtor. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Bankruptcy Court shall not consider motions to pay prepetition claims during the first twenty-one (21) days following the filing of a chapter 11 case, except to the extent relief is necessary to avoid immediate and irreparable harm.

64.     The First Day Motions include the following[11]:

i.      *Expedited Motion for Entry of an Order: (A) Approving the Form and Manner of Notice of the Commencement of this Chapter 11 Case, (B) Approving Form of Stipulation and Consent Agreement Authorizing Marketing and Sale of Ownership Interest(s) by Debtor Pursuant to 11 U.S.C. § 363(h), (C) Establishing Scope of Notice, and (D) Approving Service of Forms and Tabulation of Responses by Stretto, Inc.* (the "Motion to Approve Forms").

65.     **Motion to Approve Forms**. Debtor requests the entry of an order (a) approving the form of the Case Commencement Notice, (b) the form of the Proof of Claim, and establishing bar dates in connection therewith, and (c) the form of the Member Consent.

66.     In order to facilitate the filing of proofs of claim, procedures need to be established for a consistent and uniform process so that everyone who may potentially wish to file a claim has received notice of the related deadline and an opportunity to

---

[11] I have reviewed each of the First Day Motions filed in this Chapter 11 Case (including the exhibits thereto and supporting memoranda) and incorporate by reference the factual allegations and statements set forth therein. To the extent any factual allegations included in a First Day Motion is not expressly provided herein, such statement is adopted in its entirety and incorporated herein.

1603750327.4

do so. I believe this relief is necessary and in the best interest of Debtor's estate and parties in interests, as it will allow for a more efficient and cost saving administration of the Chapter 11 Case.

67. Additionally, Debtor requests approval of the Member Consent form. As noted above, Debtor and the Association Members own 100% of the interests in the Project as tenants-in-common. Debtor believes that a large percentage of Association Members will consent to the sale of the Project if provided with the opportunity to do so. In the Member Consent, Debtor seeks consent from Association Members to the marketing and sale of their undivided interest(s) in the Project, together with the marketing and sale of the undivided interests in the Project of Debtor and all other members of the Association. As set forth in the Motion to Approve Forms, Debtor proposes—with its Claims and Noticing Agent's assistance—to serve the Member Consent attached thereto as Exhibit C on each of the Association Members at their last-known address, thereby soliciting such Association Member's consent to the proposed sale of his/her/its undivided interest in the Project. Debtor intends to file an adversary proceeding and seek judgment from the Bankruptcy Court against Association Members who do not provide consent (any such proceeding, a "Section 363(h) Proceeding"). Debtor, however, reserves the right to file a lawsuit against consenting owners for a judgment from the

29

Bankruptcy Court authorizing the sale of the consenting owners' interest in the Project pursuant to 11 U.S.C. §363(h) and the Member Consent.

68.    Further, Debtor requests authority to use Stretto, Inc. ("Stretto") as the Claim Agent to solicit and tabulate Member Consents, so that Debtor may expeditiously and efficiently determine the Association Members that have consented to the proposed sale of the Project and the Association Members against whom Debtor must initiate a Section 363(h) Proceeding.  Debtor anticipates initiating Section 363(h) Proceeding(s) promptly; however, Debtor may opt to defer commencing such proceedings to the extent it believes it is in the best interest of the estate to do so.  Nevertheless, Debtor anticipates providing the Association Members with no less than thirty days of notice of the Member Consent to consider their response thereto (including potentially obtaining legal advice) and to return the Member Consent to the Claim Agent (who will tabulate responses received).

69.    Debtor believes the Member Consent provides sufficient information and detail to allow the Association Members to make an informed decision, and Debtor believes that the proposed timeline will provide ample opportunity for the Association Members to obtain legal advice (if desired) regarding the sale of his, her, or its interest in the Project by Debtor.  Debtor further believes that offering the Association Members an opportunity to execute the Member Consent is in the best

1603750327.4

interest of the estate, as it will obviate the need for Debtor to litigate against any Association Member who executes the Member Consent.

70.    Finally, Debtor avers that no Association Member—even those declining to execute the Member Consent—will be prejudiced by the relief sought herein. Should an Association Member choose not to sign the Member Consent, then no interest of such non-consenting members will be sold in this Chapter 11 Case until Debtor obtains such consent or obtains a judgement from the Bankruptcy Court by bringing a Section 363(h) Proceeding against the non-consenting member. I believe serving the Member Consent and tabulating the Association Member's responses in accordance with the process set forth in the Motion to Approve Forms is an efficient process that will result in cost-saving benefits to the estate and will pose no threat to Association Member's interest in the Project.

71.    I believe that the relief sought in the Motion to Approve Forms is prudent and in the best interest of Debtor, its estate, and the parties in interest, as each of the Forms and procedures will allow for the efficient and economical administration of the Chapter 11 Case, including by reducing administrative costs and ensuring the fair and consistent treatment of all parties' interests and rights.

ii.    *Debtor's Expedited Motion for Entry of an Order (I) Authorizing Debtor to Suppress Certain Personally Identifiable Information for Individual Creditors, Interval Owners, and Parties in Interest and (II) Limiting Debtor's Noticing Obligations* (the "Noticing Motion")

1603750327.4
U.S. Bankruptcy Court - Hawaii   #25-01103   Dkt # 11   Filed  12/07/25   Page 31 of 42

72.     **Noticing Motion**. Pursuant to the Noticing Motion, Debtor requests authority to (a) suppress certain personally identifiable information for only those creditors and parties in interest that are individual persons (rather than entities or businesses) and (b) limit Debtor's obligations with respect to noticing of pleadings.

73.     I believe it is appropriate to authorize Debtor to suppress from any paper filed with the Bankruptcy Court in this Chapter 11 Case, the residential addresses and email addresses of individuals that are creditors, Association Members, and parties in interest, because such disclosure may risk violating applicable privacy laws, exposing Debtor to potential civil liability and significant financial penalties. Pursuant to section 107(c) of the Bankruptcy Code and privacy protection regulations being enacted in key jurisdictions, it is appropriate to authorize Debtor to suppress such information to avoid disclosure and potential liability. Stretto, Debtor's proposed claims and noticing agent, shall maintain a list of the suppressed individuals for use by Debtor, the United States Trustee, and the Bankruptcy Court, upon request.

74.     Additionally, Debtor seeks establishment of certain proposed notice procedures for notifying creditors and interest holders of the commencement and administration of the Chapter 11 Case. Debtor has approximately 6,942 Association Members with an interest in the Project. In order to alleviate the enormous and costly burden of serving thousands of parties in interest with each filing (some of

1603750327.4
U.S. Bankruptcy Court - Hawaii  #25-01103  Dkt # 11  Filed  12/07/25  Page 32 of 42

which are voluminous), Debtor proposes to create and utilize a Master Service List to serve pleadings and other documents upon parties, including by electronic means where available. The proposed procedures will control over the applicable noticing rules contained in the Bankruptcy Rules and the Local Rules.

75.     Debtor further proposes that all filings be made available to all parties in interest on a public website maintained by the Claims Agent. I believe that this relief requested is in the best interest of Debtor's estate, as it will allow for a more efficient and cost-saving case administration. Debtor will still provide notice to any Affected Party by any particular pleading in addition to the Master Service List, and the Interval Owners have also been noticed of the Chapter 11 Case, as there was a meeting of the Association Members conducted on September 19, 2025 to discuss and vote on authorizing the filing of the Chapter 11 Case.

76.     I believe that the relief sought in the Notice Motion is prudent and in the best interest of Debtor, its estate, and the parties in interest, as each of the requested notice procedures will allow for the efficient and economical administration of the Chapter 11 Case, including by reducing administrative costs and ensuring the fair and consistent treatment of all parties' interests and rights.

1603750327.4

iii. *Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing Debtor to (A) Continue to Use Existing Cash Management System, (B) Maintain Bank Accounts and Continue Use of Existing Business Forms and Checks, and (C) Honor Certain Related Prepetition and Postpetition Obligations; (II) Determining Compliance with, or Granting a Waiver of, Certain Investment and Deposit Guidelines; and (III) Granting Related Relief* (the "Cash Management Motion")

77. **Cash Management Motion**. Debtor has filed an emergency motion seeking entry of an order: (a) granting Debtor authority to (i) continue to maintain Debtor's existing Cash Management System, including without limitation, to continue to maintain Debtor's existing Bank Accounts, as defined in the Cash Management Motion, and business forms and (ii) honor certain prepetition and post-petition obligations related thereto; (b) waiving investment and deposit guidelines of section 345 of the Bankruptcy Code and the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Chapter 11 Trustees* (the "Guidelines")[12] issued by the Office of the United States Trustee; and (c) providing any additional relief required in order to effectuate the relief requested therein.

78. Debtor maintains a cash management system in the ordinary course of Debtor's business. The Cash Management System is an integrated, centralized

---

[12] Under the Guidelines, a debtor in possession must, among other things, close all existing bank accounts and open new accounts in the name of the debtor-in-possession, establish separate accounts for the payment of taxes and cash collateral/post-petition financing, and obtain new checks and business forms that indicate the debtor's status as a debtor-in-possession. These requirements are designed to provide a clear line of demarcation between prepetition activities and transactions and post-petition activities and transactions, in order to prevent the inadvertent payment of prepetition claims during the pendency of the case.

1603750327.4

system that utilizes three bank accounts at two separate banks, including one operating account, one reserve account and one investment account. These accounts serve specific functions within the Cash Management System, including making payments, collecting fees from owners, investing excess funds, and segregating cash required for certain budgeted payment obligations (*i.e.*, in the reserve account). Debtor has specific Investment Guidelines with respect to certain Bank Accounts that require investments only in certain, specific, safe investments, with the stated goal of ensuring (a) safety of principal, (b) adequacy of liquidity, and (c) maximization of yields (in order of importance). One of the bank accounts is at First Hawaiian Bank, a depository that has signed a uniform depository agreement with the U. S. Trustee. The remaining two accounts are held at Merrill Lynch consisting of a reserve account and an investment account. I understand that the funds in the reserve account are invested in a "BLF FedFund" which invests exclusively in United States government securities, and that the funds in the investment account consists of excess cash.

79. The Cash Management System operates in accordance with ordinary, usual, and essential business practices. Through the Project Manager, Debtor maintains detailed accounting records that track transfers of funds to and from the bank accounts as a part of normal operations. The Project Manager will continue these practices as part of ongoing operations during the pendency of this case in

order to maintain governance, manage liquidity, and meet court reporting requirements. It is imperative that Debtor be able to continue using its existing Cash Management System, as it is designed to ensure (a) the safety of the cash received, (b) the adequate funding of operations and maintenance as well as taxes, and (c) compliance with local law. Thus, though its operations are relatively simple, its Cash Management System is necessarily complex. Moreover, as noted above, a substantial portion of Collections and remittances are automated for convenience. Debtor has automated payments scheduled and in place with respect to a substantial portion of its operations. I believe any change to this system, therefore, would cause, at best, immediate disruption in collections as well as unnecessary delays, and, at worst, potential violations of applicable law.

80.   The unique nature of Debtor's operations and the regulatory regime under which it operates necessitate the continuation of the Cash Management System during the pendency of the Chapter 11 Case. The system is complex and designed specifically to comply with Debtor's obligations, including to segregate cash related to reserves as well as to control disbursements and ensure cash is generating as high of a rate of return as possible without risking principal. If Debtor were required to create and implement a new cash management system, its operations would be severely disrupted, which would have an adverse impact on Debtor and result in substantial additional costs to the estate.

81. Debtor seeks a waiver of the Guideline requirements so its operations are not disrupted by the need to alter the Cash Management System, as it would create an unnecessary administrative burden and expense for the estate, while likely causing delays in the processing of payments.

82. Debtor requests further relief from the Guidelines to the extent they require Debtor to make all disbursements by check. Considering the complexity of the Cash Management System, Debtor must conduct certain transactions by debit, wire, or ACH payments and to deny Debtor the opportunity to do so would interfere with its performance of its contracts and unnecessarily disrupt its operations.

83. I believe the relief requested in the Cash Management Motion is necessary and proper considering the nature of the Cash Management System. The system, as currently designed, ensures Debtor is able to control its cash inflows and outflows, imposes strict guidelines on Debtor's investments of its cash, and protects the cash that Debtor requires for its continued compliance with applicable law.

iv. *Debtor's Emergency Application for Entry of an Order Authorizing Debtor to Employ and Retain Stretto as Notice, Claims and Solicitation Agent Effective as of the Petition Date* (the "Omni Retention Application")

84. **Stretto Retention Application.** Debtor has filed an application requesting the Bankruptcy Court approve Debtor's retention of Stretto as its claims and noticing agent. I believe such relief is prudent in light of the thousands of parties in interests to whom notices may need to be sent. I believe that the most effective

37

and efficient manner by which to give notice and process claims in the Chapter 11 Case is to engage Stretto as an independent third party with significant experience in this role. I believe the relief requested in the Stretto Retention Application is in the best interests of Debtor, its estate, and the Association Members.

v. *Debtor's Emergency Motion for Interim and Final Orders Under 11 U.S.C. §§ 105(a) and 366(c) (i) Prohibiting Utilities from Altering or Discontinuing Services on Account of Pre-petition Invoices and (ii) Establishing Procedures to Determine Request for Additional Assurance of Payment to Utilities* (the "Utilities Motion")

85.     **Utilities Motion**. Debtor requests authority, among other things, to (a) prohibiting utility companies (as defined below) from altering, refusing or discontinuing service on account of pre-petition invoices, (b) directing that each Utility shall not alter, refuse or discontinue post-petition Utility Services on account of the Debtors' Chapter 11 filings or prepetition arrearages (if any) or the failure to post a deposit; (c) establishing procedures for determining requests for additional adequate assurance; and (d) awarding such other and further relief as may be just or appropriate.

86.     In the ordinary course of operating its business, Debtor (a) incurs certain utility obligations which are paid approximately a month in arrears. I understand that Debtor is generally current on these obligations, but that as of the Petition Date, approximately half of November utility bills had not been paid.

1603750327.4

87.     Uninterrupted utility services are essential to ongoing operations. Should the Utility Companies refuse or discontinue service, even for a brief period, the Debtor's business operations could be severely disrupted.  If such disruption occurred, the impact on the Debtor's business operations and revenue would be extremely harmful and would jeopardize the Debtor's reorganization efforts. It is, therefore, critical that Utility Services continue uninterrupted.

88.     Attached to the Utilities Motion as <u>Exhibit B</u> is a true and correct summary of Debtor's utilities and average monthly usage. On average, the total utilities' consumption is approximately $23,935.

vi.     *Debtor's Emergency Motion for Interim and Final Orders Authorizing Use Cash Collateral of Bank of Hawaii* (the "<u>Cash Collateral Motion</u>")

89.     **Cash Collateral Motion**. Debtor requires the immediate use of cash collateral to avoid immediate and irreparable harm to the estate.  Debtor's business operations depend on the uninterrupted payment of ordinary and necessary operating expenses, including payroll, utilities, vendors, and other costs required to preserve and maintain ongoing operations.

90.     Without access to cash collateral, Debtor will be unable to meet these essential obligations. Such outcomes would materially diminish the value of the estate, impair the Debtor's ability to reorganize, and reduce recoveries available to all stakeholders.

1603750327.4
U.S. Bankruptcy Court - Hawaii   #25-01103   Dkt # 11   Filed  12/07/25   Page 39 of 42

91.     Attached to the Cash Collateral Motion as <u>Exhibit A</u> is a true and correct copy of the UCC Financing Statement Report (the "<u>UCC Report</u>") for the Debtor dated as of November 7, 2025, together with true and correct copies of the financing statements reflected on the UCC Report.  Attached to the Cash Collateral Motion as <u>Exhibit B</u> is a true and correct copy of Debtor's proposed cash collateral budget for the five months ending April, 2026.

**R.      Retention Applications.**

92.     Debtor intends to retain several professionals, for each of which Debtor will file several retention applications, including an application to retain a broker to market and sell the Project.   I understand that Bankruptcy Rule 6003 prohibits the Bankruptcy Court from granting an application to employ professionals during the first 21 days following the commencement of a bankruptcy case except as necessary to avoid immediate and irreparable harm.  However, Debtor must be represented before this court by (a) Choi & Ito as general bankruptcy counsel, (b) K&L Gates LLP, as special counsel, and (c) Porter Kiakona Kopper LLP, as special corporate counsel to avoid immediate and irreparable harm during the initial critical first three weeks of the Chapter 11 Case and requests entry of interim and final orders approving their retention.

**S.     Reservations and Conclusion.**

93.     Nothing contained in this Declaration, any First Day Motion, or any relief requested in this Declaration or the First Day Motions, is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against Debtor under the Bankruptcy Code or other applicable non-bankruptcy law; (b) an impairment or waiver of Debtor's or any other party in interest's right to dispute any claim against, or interest in, Debtor, its property, or its estate on any grounds; (c) a promise or requirement to pay any claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Declaration, the First Day Motions, or any relief requested therein; (f) an implication, admission, or finding as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on the property of Debtor or its estate; (g) an impairment or waiver of any claims or causes of action which may exist against any entity; or (h) a waiver of Debtor's or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

94.     I have consulted with Debtor's proposed counsel regarding the relief requested in the First Day Motions and understand each of the First Day Motions

41

and the relief requested therein. To the best of my knowledge and belief, and subject to the foregoing reservations, the factual statements contained in each of the First Day Motions are true and accurate, and each such factual statement is incorporated herein by reference.

95. I believe that the relief requested in the First Day Motions is necessary, in the best interests of Debtor's estate, its creditors, the Association Members, and all other parties in interest, and will allow Debtor to operate with minimal disruption and maximize value preservation during the pendency of its bankruptcy case. Failure to grant the relief requested in any of the First Day Motions may result in immediate and irreparable harm to Debtor and its estate. Accordingly, for the reasons set forth herein and in each respective First Day Motion, I request that the Bankruptcy Court grant the relief requested in each of the First Day Motions.

I hereby certify that, upon information and belief, the foregoing statements made by me are true and that this Declaration is executed under penalty of perjury. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: December 7, 2025

_Larry D. Warner_
Larry D. Warner

1603750327.4

U.S. Bankruptcy Court - Hawaii   #25-01103   Dkt # 11   Filed  12/07/25   Page 42 of 42